HALL, Appellant, *v.* HILLING et al., Respondents.

(No. 7,817.)

(Submitted December 12, 1938.   Decided December 29, 1938.)

[86 Pac. (2d) 648.]

*Mr. D. W. Doyle,* for Appellant, submitted an original and a reply brief, and argued the cause orally.

*Messrs. Speer & Hoffman,* for Respondents, submitted a brief; *Mr. Harvey B. Hoffman* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an action in claim and delivery for the alleged wrongful taking of approximately 1,000 bushels of wheat of the stipulated value of $725.96. It was stipulated that, since the proceeds were in the hands of the sheriff, the judgment to be rendered should be in the form of a direction by the court to the sheriff as to who was entitled to the money, in lieu of the usual judgment in a claim and delivery action.

Hall was the plaintiff below and is appellant here. Hilling and Cheetham were defendants below and are respondents here —Cheetham by virtue of his interest as mortgagee on any recovery Hilling might make of the subject matter. There is no controversy between them, as Hilling admits the validity of the chattel mortgage. The cause was tried to the court without a jury and judgment was in favor of defendants. Hall appealed.

A statement of the facts will make the final decision obvious: The land involved is a tract of 160 acres known as the "Bunker" land. It is the property of William H. Honiss, who lives in the East, and whose interests with respect thereto are cared for by George W. Moore & Company, eastern agents, and in Montana by Frary and Burlingame, real estate agents at Great Falls.

Hilling entered into a written farming agreement with James R. Moore, of Hartford, Connecticut. The negotiations were carried on through Frary and Burlingame. Under the agreement, Hilling was to occupy and farm the land from March 1, 1931, to March 1, 1934, or "until the termination of the agreement." He agreed to till the land during certain months, and to summer-fallow one-half of the cultivated land each year. He was to finance and carry on all farming operations at his own

expense, and for his labor and expense in producing the crops he was entitled to the proceeds of a three-fourths share of the same. The agreement also provided that, "In case the party of the first part [Moore] desires to sell the premises in question * * * that it may do so and deliver immediate possession to the purchaser thereof, provided, however, that in case the party of the second part [Hilling] shall have planted a crop, he shall be allowed to harvest and remove the same in accordance with the provisions of this contract, but if no crop has been planted and work has been done in preparation for the next succeeding crop, by summer tilling or otherwise, the second party [Hilling] shall receive payment for all work done by him in preparation for the next succeeding crop at the current wage."

Hilling apparently proceeded in accordance with the terms of his agreement, and in May, 1933, received a letter from Frary and Burlingame. The letter solicited information from him as to what he intended to do with the land that year, what crops he would have in, and what summer-fallowing he intended to do. In response Hilling called at their Great Falls office, and at the trial testified that he was told, probably by Burlingame, "to go ahead to farm the place the same as he always did," and that if the place were sold, they would pay him for his summer-fallowing. Otherwise, division of the crop was to be on the same basis as the written agreement—three-fourths to Hilling and one-fourth to the owner of the land.

In February, 1933, Frary and Burlingame corresponded with Hall toward the end that they might interest him in the purchase of the land. The letters disclosed a preference for Hall to Hilling to operate the place. No sale was consummated, but Hall was kept informed that Hilling had been notified to vacate the premises to make way for a new tenant. Finally the following letter was sent to Hall from Frary and Burlingame: "We are returning your leases herewith, as the owner of the land, who lives in Hartford, Conn., refuses to sign or lease the same. Should you wish to offer a cash rental to use this land

for grazing, we would submit it. However, it would have to be subject to cancellation on notice, with a return of a proportionate part of the rental price." The date of this letter does not appear in the record, but in April, 1934, possibly pursuant to the suggestion of the letter, Hall entered into a one-year agreement beginning April 1, 1934, for the use of the land. As the terms of that instrument become important in determining Hall's right to possession, we set it out as follows:

"This authorizes Mack Hall of Brady, Montana, for the consideration hereinafter named to use all of the [description] land, known as the Dougald E. Bunker land for pasturage, grazing and hay cutting purposes for the term from April 1, 1934, to April 1, 1935. This privilege is given and accepted on the following conditions:

"The right to sell the land and giving immediate possession is reserved in which case the tenant agrees to the cancellation and surrender of the rights hereunder on the return of the unearned portion of the amount herein named as a consideration for the same.

"Subject to any former lease.

"Lessor does not guarantee against trespass. It is understood that this agreement or permit shall terminate April 1, 1935, unless the land is sooner sold. Tenant agrees to keep up the fences.

"The consideration being—Fifty and no/100 Dollars cash rental per year, payable in advance at the office of Frary & Burlingame, Great Falls, Montana, for and during the term of this lease.

"WILLIAM H. HONISS, Lessor.
"X MACK HALL.

"Filed—June 28, 1937."

Hall proceeded to pasture part of the land with sheep, and in addition seeded 40 acres to wheat, and repaired some of the fences.

In April, 1934, Hilling commenced seeding the 33-acre portion of the land which he had summer-fallowed the year before.

His written lease or contract had expired March 1 preceding. Hall went to the field and told Hilling that he, Hall, had the land leased. Hilling asked him if he would pay him for his summer-fallowing, to which Hall replied, "No." Nothing further occurred, and Hilling completed his drilling operations.

In May, 1934, at the instigation of Frary and Burlingame, an unlawful detainer action was instituted in the justice court, entitled *James R. Moore* v. *Tom Hilling*, to recover the land. Neither Hall nor Hilling actually resided on the land, but each lived on a farm near by. Upon a hearing of that action the court made the following finding: "That the plaintiff [Moore] be given immediate possession of the property described in the complaint, except the 33 acres hereafter mentioned and sown to crop by defendant [Hilling.] The defense to be allowed to reap a crop consisting of 33 acres on the same terms as set forth in the lease which expired March 31st [1st?], 1934."

In August, 1934, Frary and Burlingame wrote the following letter to Hall: "As you know, we are entitled to our one-fourth share of the 1934 crops raised by Tom Hilling on the Bunker land. Will you write us at once, giving us an idea of how many acres he had in, kind of crop, how many acres harvested and if he has not harvested, when he will harvest and about how many bushels to the acre."

The present action was instituted in August, 1934, and pursuant thereto the sheriff stepped in and took charge of the threshing and marketing of the wheat to preserve it *in custodia legis* pending the ultimate determination of rights with respect thereto. The cause came to trial and after all the testimony was in, the court made its decision in favor of Hilling and Cheetham. In part, the judgment recited: "And the court further finds that the plaintiff has wholly failed to establish or prove his right, title, claim or interest in or. to said property or in or to the proceeds thereof, or to have judgment for the value thereof."

The specifications of error assigned are directed at the court's action in admitting certain testimony and exhibits, and the

ultimate rendition of judgment in favor of defendants. The latter specification tenders the important question for decision, i. e., Is there substantial evidence to support the judgment? We shall dispose of it first.

The action being one in claim and delivery, it was incumbent upon plaintiff to plead and prove by a preponderance of the evidence the following: Ownership or right of possession in himself; that defendant is wrongfully in possession; and the value of the property. (*Hennessy Co.* v. *Wagner,* 69 Mont. 46, 220 Pac. 101; *Perham* v. *Putnam,* 82 Mont. 349, 267 Pac. 305; *Gallick* v. *Bordeaux,* 31 Mont. 328, 78 Pac. 583.) A corollary to this rule is that plaintiff must rely upon the strength of his own title and right of possession and not upon the weakness of his adversary's claim to such right. (*Davey* v. *Davey,* 81 Mont. 375, 263 Pac. 415; *Stephenson* v. *Combination Leasing & Dev. Co.,* 86 Mont. 322, 283 Pac. 1110; *Kipp* v. *Silverman,* 25 Mont. 296, 64 Pac. 884.) Upon these well-established principles this decision must rest, and we shall consider the evidence with them in mind.

Hilling admittedly had the right of possession of the land for three years according to his written farming agreement, which, by its terms, was to expire March 1, 1934. He also had a right, and perhaps a duty, under his contract to summer-fallow the land in 1933, as the contract was still in operation at that time. It called for summer-fallowing of one-half the cultivated land each year. Apparently knowing that Frary and Burlingame were anxious to sell the land, and in response to a letter of inquiry from that firm, Hilling called upon them at their office to make sure whether he should go ahead with his summer-fallowing work the last year of his written contract. He was told to go ahead and farm the place the same as he always had, and that he would be paid for any summer-fallowing in case the land was sold. This he proceeded to do, and for all practical purposes the terms of his written contract were orally extended at least through the 1934 harvesting and threshing season. It may fairly be assumed from the evidence that

it was clearly the mutual understanding of Hilling and Frary and Burlingame that Hilling was to farm the summer-fallowed part of the land beyond the March 1, 1934, expiration date, subject to the provisions and conditions of the original agreement.

It is plain, also, from the evidence that while Hilling was to go ahead as before, the real estate agents were in the meantime trying to sell the land to Hall. In fact, after the summer-fallowing of 1933 was done, these agents wrote several letters to Hall, telling him that Hilling had been notified to vacate the premises. If the sale had gone through, quite clearly, under the terms of the agreement, Hilling would have been entitled to wages for his work of summer-fallowing done on the land in the summer of 1933. Hilling received a letter telling him to quit farming the place, and that the owner of the land would not renew his lease. This letter was written in December, 1933. Therein it was said that Hilling was expected to give up possession of the land by March 1, 1934. He received another notice to quit the place in April, 1934, which he apparently ignored; and then still another about a week later the same month. Hilling continued to farm the land in the spring of 1934 even after Hall entered upon a portion of the land with his sheep. Hall, in addition to grazing his sheep, also proceeded to plant 40 acres of the land to wheat. Hall's and Hilling's activities must have been obvious to each other. No offer was ever made to pay Hilling for his 1933 summer-fallowing which, under the written contract, someone most surely was obliged to do in lieu of letting him proceed with the 1934 harvest, to get his pay for his work.

It must be remembered that in Hilling's contract, Moore agreed to pay him the three-fourths share of all crops raised in return for his labor and expense in producing such crops. Summer-fallowing operations were certainly an important and major item of such expenses. Moore further agreed that in case the land was sold at a time subsequent to Hilling's summer-fallowing, or other work, he would reimburse him for all such

work at the current wage. The agreement is not specific as to whether Hilling should be paid for such work in the event of a subsequent lease or grazing rental to someone else; however, the only logical construction of the agreement in such case, and especially so in the light of the subsequent oral permission given Hilling to go ahead, would seem to allow him to sow and harvest the following year's crop and to retain a three-fourths share thereof as he had always done under the agreement. The agreement never contemplated that he should be paid any cash for his work in preparing the ground for the next year's crop, except, of course, where some disposition was made of the property after the work had been done. He was always expected to get his pay for work and materials furnished out of the subsequent year's crop. If, on the other hand, a new tenant were sought to be placed on the land and who would naturally benefit from any summer-fallowing already done, the owner was obliged to compensate Hilling in some way as was provided in the agreement in case a sale of the premises was made.

In August, 1934, the letter set out supra was written to Hall by Frary and Burlingame, showing that it was their intention and understanding that Hilling was to get three-fourths of the crop as usual. Hall admitted receiving this letter and therefore knew the crop was expected to go to Hilling. Also, as further evidence of the fact that Hall did not expect to claim the crop, he testified in the following manner with respect to a conversation had with the sheriff concerning the cutting and handling of the crop: "As to whether I made arrangements with him [Hilling] that I would account to him for the crop, I said if Hilling would give me one-quarter of the crop, I would go, pay expenses." From this it is obvious that Hall was willing not to interfere with the harvest of the 33-acre crop in consideration of one-quarter of that crop—the landowner's usual share under Hilling's original written contract and the oral extension thereof.

The owner of the land was clearly entitled to one-quarter share of the crop under both the written and oral agreements

entered into with Hilling. It is difficult to see, under the circumstances here presented, by virtue of what right or authority Hall might consider himself as succeeding to that right. His interest in the land and the 33-acre crop raised thereon must be gathered from the written agreement he had with respect thereto. Reference to its terms, set out supra, shows clearly that his use was a limited one, and that, at best, for the nominal sum of $50 a year rent, it was not guaranteed against trespass and, in addition, was made subject to any former lease. The instrument was signed by William H. Honiss, lessor, the owner, and came to Hall through Frary and Burlingame. From its terms it is clear that Hall was amply placed on notice as to the possibility of any prior lease or farming agreement on the land, and his use was naturally subordinate thereto in case of conflict with such prior arrangement.

Hall's position certainly was no better than the owner's. It is too plain to necessitate argument that if the owner or his agents, assuming no lease had been given to Hall, had attempted to interfere with Hilling after he had done his summer-fallowing in 1933, Hilling would either have been entitled to compensation for his work, or authorized to go ahead with the harvest and get his pay in that manner. Surely Hall could expect no better terms, especially in view of the plain notice in his lease that his use was subject to any former lease. True, Hall planted a crop in addition to using the land for the purposes specified in the agreement, for which the owner might possibly have had redress under section 7735, Revised Codes. Still, the justice court in the unlawful detainer action recognized the right in Hilling to harvest the 33 acres he had prepared and to retain the proceeds therefrom. Agents Frary and Burlingame likewise recognized that right subject only to the three-fourths and one-quarter division with the owner as per the original written agreement. Hall actually knew these things and was put on notice as well by the express provision in his lease, and used the land subject to and in accordance with that knowledge. In fact, he testified that he had made

no arrangements with Honiss with regard to any crop on the land that Hilling had summer-fallowed, and said: "I knew the terms and conditions under which Mr. Honiss had been leasing that land in regard to the crop; Honiss was to have one-quarter share of the crop." All the events and circumstances mentioned breathe the breath of life into the oral agreement between Hilling and the Bunker land agents, and give vitality and a practical construction to that portion of Hall's agreement which made his use subject to any former lease.

We do not deem it necessary to discuss whether either Hilling's written or oral agreements amounted to what the law regards to be a lease. The term seems to have been used rather loosely throughout the whole record. The facts, circumstances and course of conduct with respect thereto lead us convincingly to the conclusion that there is substantial evidence to support the judgment in defendants' favor, as well as to demonstrate that plaintiff Hall has failed to prove by a preponderance of the evidence that he was entitled to the possession of the proceeds of the wheat involved.

The alleged error with regard to the admission of the Cheetham mortgage in evidence, if error, was harmless in view of the fact that there was no controversy as between defendant Hilling and Cheetham. Cheetham would appear to be in the shoes of Hilling with respect to any rights in the proceeds of the wheat.

Hall having had the affirmative of showing ownership or right of possession in himself, and having failed, it is unnecessary to discuss any question of authority in Frary and Burlingame orally to continue Hilling's farming agreement through the harvest of the 1934 crop.

Judgment affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.

Rehearing denied January 28, 1939.